**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF NEW YORK**
-------------------------------------------------X
S&S MACHINERY CORP.,

              Plaintiff**,**

           -against-

WUHAN HEAVY DUTY
MACHINE TOOL GROUP CO., LTD.

              Defendant.
-------------------------------------------------X

<u>**REPORT & RECOMMENDATION**</u>

07-CV-4909 (NGG) (RER)

**RAMON E. REYES, JR., U.S.M.J.**:

### TO THE HONORABLE NICHOLAS G. GARAUFIS, U.S.D.J.:

S&S Machinery Corp. ("S&S") brings this action against Wuhan Heavy Duty Machine Tool Group Co., Ltd. ("Wuhan"), for breach of an agency agreement between the parties. Due to Wuhan's failure to appear or otherwise answer, the Clerk of the Court entered default on April 3, 2009. On July 8, 2011, S&S moved for default judgment. Your Honor referred the matter to me for a report and recommendation.

For the reasons explained below, I respectfully recommend that S&S's motion be granted in part, and that judgment be entered against Wuhan in the amount of $391,454.53 in damages, plus pre-judgment interest at a rate of $96.52 per diem from December 31, 2000 through the date of entry of final judgment, as well as post-judgment interest at the statutory rate.

# FACTUAL BACKGROUND[1]

### A.     The Parties

S&S is a New York corporation with its principal place of business in Brooklyn, New York.  (Compl. ¶ 1.)  S&S sells machine tools in the United States. Its products include large power-driven boring mills, planer mills, grinders, gear hobbing machines and rotary tables. (Srybnik Aff. ¶¶ 2, 3.)

Wuhan is a Chinese corporation with its principal place of business in the Wuchang district, Wuhan, China.  (Compl. ¶ 2.)  At the time this action was commenced, Wuhan was one of the largest machine tool manufacturers in China.  (Srybnik Aff. ¶ 6.)

### B.     The Agency Agreement

On October 23, 1999, the parties executed an Agency Agreement.  (*Id.* ¶ 7, Exh. A ("Agency Agreement," "Agency Agmt." or "Agreement."))  Under the terms of the Agreement, S&S became Wuhan's exclusive agent in North and South America.  (Compl. ¶ 6; Agency Agmt. ¶ 1.)  As such, S&S was authorized to handle all inquiries and orders for Wuhan products in North and South America, and agreed in turn to actively promote Wuhan's products through advertisements and trade shows.  (Agency Agmt. ¶¶ 2-3.)

For its part, Wuhan agreed to provide S&S with necessary technical and sales materials, and immediately inform S&S of any modifications to existing products, and development of new products.  (*Id.* ¶ 4.)  Wuhan agreed to send appropriate technical personnel to Brooklyn, if

---

[1]  In light of the brevity of the Complaint, these facts are largely contained in the Affidavit of Simon Srybnik, S&S's founder and Chairman, submitted in support of the motion for a default judgment.  (Affidavit of Simon Srybnik in Support of Motion for Default Judgment (Docket No. 35) ("Srybnik Aff."))

necessary, to assist S&S in product service and maintenance, with expenses for such services to be borne by S&S. (*Id.* ¶ 5.) S&S also agreed to select and stock vertical boring mills, machining centers and flexible machining units in its Brooklyn, New York "exhibition facility." (*Id.* ¶ 6.)

Of critical importance to S&S's current claim, in the Agency Agreement it agreed to "select the first machine to be displayed in the next National Machine Tool Show in Chicago." (*Id.* ¶ 7.) Payment terms, but not price, were set in the Agency Agreement for "the first machine" and any and all future machines S&S purchased.

The Agency Agreement was valid for three years, and would be automatically extended for one year if neither party requested termination at the conclusion of the initial three-year period. (*Id.* ¶ 10.)

C.     The Purchase Contract & The Vertical Boring Mill

On or about May 31, 2000, S&S entered into a contract with Wuhan to purchase a vertical boring mill for $198,000. (Wuhan Letter rec'd 7/20/2009, Exh. 2 (Docket No. 17) ("the Purchase Contract."))[2] Apparently, this boring mill was the "first machine" referenced in the Agency Agreement. (*See* Srybnik Aff. ¶ 19.) The Purchase Contract contained an arbitration clause which provides:

> All disputes in connection with this contract or arising from the execution there of shall be amicably settled through negotiation. In case no settlement can be reached between the two parties, the case under disputes [sic] shall be submitted to china international economic and trade arbitration commission Beijing [sic] for arbitration in accordance with its rules of arbitration. The arbitral award is final

---

[2]  Wuhan provided to the Court the Purchase Contract of the boring mill as part of its objection to the Court's assertion of personal jurisdiction over it. S&S does not appear to contest the authenticity or validity of the contract. (Memorandum of Law in Support of Plaintiff S&S Machinery Corp.'s Motion for Default Judgment at 11-12 (Docket No. 34) ("Pl. Mem."))

and binding upon both parties. The arbitration fee shall be borne by the losing party unless otherwise awarded by the arbitration court.

(Purchase Contract ¶ 6.)

On June 8, 2000, Wuhan sent S&S an invoice for the boring mill. (Srybnik Aff. ¶ 22, Exh. D.) On October 16, 2000, S&S paid a twenty percent down payment ($39,600) for the mill pursuant to the terms of the Agency Agreement. (*Id.* ¶ 22.) S&S subsequently received the boring mill and arranged to ship it to the 2000 International Machine Tool Show ("IMTS") in Chicago, Illinois. (*Id.* ¶ 23.) At the IMTS in Chicago, S&S set up the boring mill, but it did not function properly. According to S&S, Wuhan sent two employees to the IMTS to install and service the boring mill, but these employees were unable to make the machine functional. (*Id.* ¶¶ 24-25.) S&S was unable to present a functioning vertical boring mill throughout the entire IMTS trade show. (*Id.* ¶ 25.)

At the conclusion of the IMTS, S&S paid for the inoperable machine to be transported back to S&S's facility in Brooklyn, New York. (*Id.* ¶¶ 29-44, Exh. F (reflecting costs of shipping machine back to New York), Exh. G, H, I, J (showing costs and payments made during IMTS as well as deductions.)) From 2000 to 2004, S&S sought technical assistance from Wuhan for help with the inoperable vertical boring mill, but Wuhan refused to provide such assistance. (*Id.* ¶ 45.) In July 2004, S&S sent an e-mail to Wuhan asking that it send certain electronic files, called "parameters," that would allow the machine to function properly. (*Id.* ¶ 46.) Wuhan neither responded nor provided the parameters.

From June 2004 through June 2005, S&S paid another company to service the boring mill and see whether it could be made operable. Those efforts proved unsuccessful (*id.* ¶ 47, Exh. P),

and S&S has been storing the inoperable vertical boring mill at its Brooklyn facility since 2000 (*id.* ¶ 50).

## PROCEDURAL HISTORY

On November 26, 2007, S&S filed the complaint in this action. By September 10, 2008, it was unclear whether S&S properly served Wuhan, and therefore Judge Cogan, to whom the case was then assigned, ordered S&S to show cause why the case should not be dismissed without prejudice for failure to issue timely service. (Docket Entry dated 9/10/08.) On September 18, 2008, Judge Cogan granted S&S's motion for six-month extension in which to file proof of service. (Docket No. 7.) S&S filed proof of service on March 16, 2009. (Docket No. 8.)[3]

On February 24, 2009, Wuhan commenced an arbitration before the China International Economic and Trade Arbitration Commission ("CIETAC") to recover the unpaid balance of the Purchase Contract. (Arbitral Award at 3 (Docket No. 37.))[4] According to the unverified translation of the CIETAC final Arbitral Award, S&S challenged the arbitration, contending that the dispute between the parties arose under the Agency Agreement and that the Agreement had

_____

[3] On March 16, 2009, Judge Cogan recused himself and the case was assigned to Your Honor. (Docket Entry dated 03/16/09.)

[4] These facts come from the CIETAC arbitral award which Wuhan submitted to this Court. S&S has not contested the authenticity of the Arbitral Award. The CIETAC arbitration was commenced over one year after this action was first filed (*see* Docket No. 37), and over eleven months after the Chinese Ministry of Justice was provided translations of the summons, complaint and all other documents required to be served pursuant to the Hague Convention. (*See* Docket No. 1; Motion for Extension of Time at 2 (Docket No. 6).)

no arbitration clause.  (*Id.* at 4.)  Nevertheless, S&S participated in the arbitration through counsel.  (*Id.* at 5-6.)

On March 19, 2009, S&S filed a letter motion for entry of default as Wuhan had not yet filed an answer.  (Docket No. 10.)  On April 1, 2009, I issued an order directing the Clerk of the Court to enter default against Wuhan, holding that service of process on Wuhan was properly effectuated pursuant to Rules 4(h)(2) and (f)(1) of the Federal Rules of Civil Procedure and the procedures set forth in Article 15 of the Hague Convention on the Service Abroad of Judicial and Extrajudicial Documents.  (Docket No. 15.)[5]  The Clerk entered a default against Wuhan on April 3, 2009.  (Docket Entry dated 4/3/09.)

On April 21, 2009, the Court received a letter from Wuhan dated April 16, 2009, contesting the Court's exercise of subject matter jurisdiction over S&S's claims due to the CIETAC arbitration.  (Docket No. 16.)  Upon receipt of this letter, Your Honor issued an order

---

[5]  Pursuant to FED.R.CIV.P. 4(h)(2), a foreign corporation may be served with process "in any manner prescribed by FED.R.CIV.P. 4(f) for serving an individual, except personal delivery under (f)(2)(C)(i)."  FED.R.CIV.P. 4(f) provides that a foreign individual may be served pursuant to "any internationally agreed means of service that is reasonably calculated to give notice, such as those authorized by the Hague Convention on the Service Abroad of Judicial and Extrajudicial Documents."  The United States and China are signatories to the Hague Convention.  S&S served Wuhan pursuant to the Hague Convention on March 16, 2009.  (*See* Docket No. 8.)  Although it is not clear whether the Ministry of Justice of China complied with its obligations under the Hague Convention, it is clear that Wuhan received notice of this lawsuit due to the many letters it submitted to the Court.  Despite the lack of a definitive certificate of service, the Court determined that service had been effectuated pursuant to the Hague Convention.  (*See* Docket No. 15); *see also Burda Media, Inc., v. Viertel*, 417 F.3d 292, 300-301 (2d Cir. 2005) (service of process proper under Hague Convention notwithstanding failure of French Central Authority to return a certificate of service because plaintiff attempted in good faith to comply with Convention and defendant had sufficient notice of action such that no injustice would result).

advising Wuhan to file an appearance in the action and make a formal motion to vacate the entry of default no later than June 30, 2009. (*Id.*) No motion was ever filed.

On July 20, 2009, the Court received another letter from Wuhan again contesting the Court's exercise of subject matter jurisdiction over S&S's claims. (Docket No. 17.) On January 13, 2010, noting that Wuhan had filed two letters contesting the Court's subject matter jurisdiction (July 20, 2009 and January 8, 2010), but had neither made an appearance nor filed a motion to vacate entry of default, Your Honor issued an order extending Wuhan's time to do so until February 26, 2010. (Docket No. 18.) Your Honor later extended Wuhan's time until March 19, 2010 to appear and file a motion to vacate entry of default. (Docket No. 21.) Wuhan has yet to make an appearance or file a motion to vacate entry of default.

On December 24, 2009, CIETAC issued the final Arbitral Award. (Docket No. 37.) The CIETAC arbitral panel ruled in Wuhan's favor, awarding $119,284.05 for the unpaid balance of the Purchase Contract; interest at 4% from January 1, 2003 to February 10, 2009; RMB 200,000 in attorney's fees and costs; and RMB 61,908 in arbitration fees paid by Wuhan. To date, Wuhan does not appear to have attempted to enforce the Arbitral Award in the United States.

On March 22, 2011, counsel for S&S appeared at a scheduled conference, but counsel for Wuhan did not. (Docket Entry dated 3/22/11.) S&S was instructed to move for default judgment, and in so doing address the issues of personal jurisdiction; the effect, if any, of an arbitration award from China in Wuhan's favor; and damages. (Motion for Default Judgement (Docket Nos. 33-35.)) On July 8, 2011, S&S moved for default judgment.

## DISCUSSION

A.    Personal Jurisdiction Over Wuhan

The lack of personal jurisdiction is an affirmative defense that is waived upon failure to assert it in a motion under Federal Rule of Civil Procedure 12(b)(1) or in a responsive pleading. *See* Fed.R.Civ. P. 12(h)(1); *Transaero, Inc. v. La Fuerza Aerea Boliviana*, 162 F.3d 724, 729 (2d Cir. 1998). Personal jurisdiction is thus waived upon default. Nevertheless, the Court chooses to conduct this brief jurisdictional analysis due to the absence of any affirmative assertion of personal jurisdiction over Wuhan in the Complaint (¶¶ 1-5) and its independent obligation to ensure that it has jurisdiction over the parties.

The determination of whether a federal court has personal jurisdiction over a foreign corporation involves a two-step process: first, the Court must determine whether the defendant is subject to personal jurisdiction under the forum state's law; second, the Court must evaluate whether its assertion of jurisdiction comports with the requirements of due process. *Nat'l Union Fire Ins. Co. of Pittsburgh, PA. v. BP Amoco P.L.C.*, 319 F. Supp. 2d 352, 357 (S.D.N.Y. 2004) (Lynch, J.) (internal citations omitted).

A non-domiciliary corporation is subject to personal jurisdiction in New York under New York Civil Practice Law and Rules §302 (a) (1) if two requirements are met: first, that the defendant transacted business within the state or contracted anywhere to supply goods or services in the state; and second, that the cause of action arose from those activities. *Sea Tow Servs. Int'l v. Pontin*, 472  F. Supp. 2d 349, 358 (E.D.N.Y. 2007) (Bianco, J.) (citing *Sole Resort, S.A. de*

*C.V. v. Allure Resorts Mgmt.*, *LLC*, 450 F.3d 100, 103 (2d Cir. 2006)).[6]  The exercise of personal

jurisdiction over a defendant will comply with due process standards if (1) the plaintiff's claims

arise out of or relate to defendant's contacts with the forum (minimum contacts), and (2) the

exercise of jurisdiction comports with traditional notions of fair play and substantial justice (due

process).  *Id.* at 361 (citing *Int'l Shoe Co. v. Washington*, 326 U.S. 310, 316, 66 S.Ct. 154, 90

L.Ed. 95 (1945)).  There is no question that Wuhan "transacted business" in New York, that

S&S's claims arise out of Wuhan's contacts with New York, and that the exercise of personal

jurisdiction over Wuhan comports with due process.

Through the Agency Agreement, Wuhan contracted to make S&S, a New York

corporation, its exclusive agent and distributor in North and South America.  Moreover, Wuhan

contracted to supply machines and send product updates, necessary technical assistance, sales

materials and engineering staff to S&S in New York.  Although the record is silent as to where

the Agency Agreement was executed, it is clear that after the parties entered into it, Wuhan

actually sent an engineer to Brooklyn to inspect S&S's facilities.  Wuhan subsequently shipped a

vertical boring mill to S&S's Brooklyn facility.  According to the allegations in the Complaint,

Wuhan provided an inoperable machine, refused to provide any technical assistance for it and

failed to respond to S&S's inquiries regarding the machine in subsequent months.  S&S's claims

arise directly from these acts and omissions in breach of the Agency Agreement.  Personal

---

[6]  C.P.L.R. § 302(a)(1) "is a 'single act statute' and proof of one transaction in New York
is sufficient to invoke jurisdiction, even though the defendant never enters New York, so long as
defendant's activities here were purposeful and there is a substantial relationship between the
transaction and the claim asserted."  *Zottola v. AGI Group, Inc.*, 63 A.D.3d 1052, 882 N.Y.S.2d
445, 447 (2nd Dep't 2009) (citing *Kreutter v. McFadden Oil Corp.*, 71 N.Y.S.2d 460, 466-467, 527
N.Y.S.2d 195, 198-199 (N.Y. 1988)).

jurisdiction over Wuhan comports with traditional notions of fair play and substantial justice because Wuhan deliberately availed itself of the privileges and benefits of doing business in New York. Wuhan explicitly chose New York as the place from which it would take orders and supply goods, through S&S acting as its agent. Being hailed into court in New York is not an unreasonable burden on Wuhan because it has already taken action in New York regarding this lawsuit. Wuhan retained counsel in December 2008 and participated in unfruitful settlement negotiations in January 2009. (Decl. of Steven J. Cohen, Exh. A ¶¶4(a)-(f) (Docket No. 11.)) The vertical boring machine in question is in New York. Further, New York has an interest as adjudicating this case because it is S&S's home state.

B.     Effect of the CIETAC Arbitral Award

S&S was directed to address in its motion papers the effect, if any, the CIETAC Arbitral Award has on its motion for a default judgment. S&S argues that due to Wuhan's default, it has waived any affirmative defenses based on the CIETAC arbitration. While I disagree, I nevertheless find that the CIETAC Arbitral Award does not have any preclusive effect on this action.

The CIETAC Arbitral Award does not bar the Court from entertaining S&S's motion for a default judgment and awarding it damages for the simple reason that the Agency Agreement contains no arbitration clause and the CIETAC arbitration did not the resolve issue presented in this lawsuit – whether Wuhan breached the Agency Agreement. The central issue in the CIETAC arbitration was whether S&S failed to pay the balance owed on the Purchase Contract. (Arbitral Award at 28-31.) Although S&S raised the issue of Wuhan's various breaches of the Agreement as a defense to Wuhan's claim for the balance due under the Purchase Contract, and

the CIETAC arbitral panel ruled that it had jurisdiction over disputes involving the Agreement, the arbitral panel never reached S&S breach-of-Agreement-based defenses. (*Id.* at 28-29.) Indeed, the panel expressly concluded that because S&S withdrew its counterclaims based on the breach of the Agreement, it was not reaching those issues and S&S still had "the right to require [Wuhan] to compensate the loss the Defendant suffered from due to the quality of the goods in the form of counterclaim or lodging arbitration, *or remedy in other ways*, but can not refuse to effect the payment for this reason after receipt of the goods." (*Id.* at 29) (emphasis added).

C.    Liability

"The dispositions of motions for entries of defaults and default judgments . . .  are left to the sound discretion of a district court because it is in the best position to assess the individual circumstances of a given case and to evaluate the credibility and good faith of the parties." *Enron Oil Corp. v. Diakuhara*, 10 F .3d 90, 95 (2d Cir. 1993).[7]  Ordinarily, when a default is entered, all well-pleaded factual allegations in the complaint are accepted as true. *E.g., Greyhound Exhibitgroup v. E.L. U.L. Realty Corp.*, 973 F.2d 155, 158 (2d Cir. 1992). Nevertheless, even when there is a default a district court must determine whether the allegations in the complaint state a claim upon which relief may be granted. *See Au Bon Pain Corp. v. Artect, Inc.*, 653 F.2d 61, 65 (2d Cir. 1981) (recognizing the court's authority, even after default, to determine whether plaintiff has stated a cause of action); *Nishimatsu Construction Co. v.*

---

[7]  Relevant factors in weighing a motion for default judgment include whether (1) a movant will be prejudiced by delay, (2) the grounds for default are clearly established, (3) default was willful and (4) there are meritorious defenses. *See O'Callaghan v. Sifre*, 242 F.R.D. 69, 73 (S.D.N.Y. 2007) (citing 10A Alan Wright, Arthur R. Miller & Mary Kay Kane, Federal Practice & Procedure § 2685 (3d ed.1998); *see also Pecarsky v. Galaxiworld.com, Ltd.*, 249 F.3d 167, 170–71 (2d Cir. 2001). All three factors weigh in favor of granting S&S's motion.

*Houston National Bank*, 515 F.2d 1200, 1206 (5th Cir. 1975) ("The corollary of this rule, however, is that a defendant's default does not in itself warrant the court in entering a default judgment. There must be a sufficient basis in the pleadings for the judgment entered."); JAMES WM. MOORE ET. AL., MOORE'S FEDERAL PRACTICE § 55.12 (3d ed. 2004) ("[P]laintiff's conclusions of law are not deemed established. Thus the court may grant only the relief for which a sufficient basis is asserted in the complaint."); *see also Caterpillar, Inc. v. Williams*, 482 U.S. 386, 392 (1987) (under well-pleaded complaint rule, court must look to face of complaint to determine whether claim "arises under" federal law).

Under New York Law,[8] a plaintiff can establish a prima facie case for breach of contract by showing (1) the existence of a contract; (2) the breach of the contract by the defendant; and (3) damages suffered as a result of that breach. *National Market Share, Inc., v. Sterling Nat'l Bank*, 392 F.3d 520, 525 (2d Cir. 2004) (citing *RIJ Pharm. Corp. v. Ivax Pharms., Inc.*, 322 F. Supp. 2d 406, 412 (S.D.N.Y. 2004)). Plaintiff need not plead every fact individually so long as plaintiff submits a "'short and plain statement of the claim showing that the pleader is entitled to relief.'" *Posner v. Minnesota Mining & Mfg. Co.*, 713 F. Supp. 562, 563 (E.D.N.Y. 1989) (quoting FED.R.CIV.P. 8(a)(2)).

S&S's four-page complaint is "short and plain" to the extreme. In it, S&S pleads that (1) it had a contract with Wuhan (¶ 6); (2) Wuhan "breached its Agency Agreement" by, among

_____

[8] Although S&S does not address the question of what law to apply, its relies exclusively on New York substantive law in discussing the common law claims asserted. Since Wuhan has not appeared and S&S's tacit consent to New York law "concludes the choice of law inquiry," I apply New York law in analyzing S&S's common law claims. *See 3Com Corp. v. Banco Do Brasil, S.A.*, 171 F.3d 739, 743 (2d Cir. 1999); *American Fuel Corp. v. Utah Energy Dev. Co.*, 122 F.3d 130, 134 (2d Cir. 1997); *see also Krumme v. WestPoint Steven Inc.*, 238 F.3d 133, 138 (2d Cir. 2000).

other things, "failing to provide technical and sales material as are required by ¶4 of the Agreement" (¶¶ 8-10); and (3) S&S was damaged thereby (¶¶ 11-12).[9]  What the Complaint lacks, however, are factual details on the ways in which Wuhan breached the various provisions of the Agency Agreement.  Thus, the Complaint itself appears to be insufficient.  *See generally Ashcroft v. Iqbal*, 556 U.S. 662, 129 S. Ct. 1937, 1949 (2009) ("A pleading that asserts only 'labels and conclusions' or 'a formulaic recitation of the elements of a cause of action will not do.'") (quoting *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 555 (2007)); *Nishimatsu Construction Co.*, 515 F.2d at 1206 ("The defendant is not held to admit facts that are not well-pleaded or to admit conclusions of law.").

Nevertheless, default judgment is appropriate in this case.  Rule 55(b)(2) of the Federal Rules of Civil Procedure permits courts to "conduct hearings or make referrals . . . when, to enter or effectuate [default] judgment, it needs to . . . establish the truth of any allegation by evidence. . . ."  Your Honor made such a referral to me, and in issuing this Report and Recommendation I considered the Affidavit of Simon Srybnik, S&S's founder and chairman, which contains all of the factual details on Wuhan's alleged breaches that were omitted from the Complaint.  (Docket No. 35.)[10]  Srybnik describes in detail how the contract was formed (¶¶ 2-7, 9-10), what the

---

[9]  S&S also alleges that Wuhan breached the Agency Agreement "by failing to provide machinery with such *specifications, prices, and/or deliveries* as are required by ¶3 of the Agreement."  (Compl. ¶ 7) (emphasis added).  Paragraph 3 of the Agency Agreement does not, however, require Wuhan to do so.  S&S appears to take the emphasized language completely out of context.  Indeed, paragraph 3 imposes obligations on S&S, not Wuhan.

[10]  I recognize that this approach may appear to be somewhat unusual, as courts typically consider only the allegations in the complaint when determining liability on a motion for a default judgment.  *E.g., Choi v. Kim*, No. 04-cv-4693 (ILG), 2006 WL 3535931, at *4 (E.D.N.Y. Dec. 7, 2006) (order adopting report and recommendation).  Nevertheless, this is an unusual case.  Moreover, a similar procedure was followed in *Continental Insurance Company v. Huff*

contract encompassed (¶¶ 12-18), how S&S performed its end of the bargain (¶¶ 19-24), how S&S sought Wuhan's performance under the contract, how Wuhan breached the contract (¶¶ 25-28, 45-46, 48-49, 51-57), and how S&S was damaged (¶¶ 8, 29-44, 47, 50).  S&S served Wuhan with a copy of the Affidavit and its moving papers by first class mail, and Wuhan was therefore on notice of the claimed breaches of the Agency Agreement.[11]

Considering the Complaint and the Srybnik Affidavit collectively, with one minor exception S&S has established Wuhan's liability for breach of contract under New York common law; the only exception being with respect to paragraph 3 of the Agreement.  Paragraph 3 provides that "*[S&S] shall* consider [Wuhan's] products of the highest priority to sell so long as permitted by specifications, price, delivery, and other customer requirements.  *[S&S] shall*

_____

*Enterprises, Inc.*, No. 07-cv-3821(NGG), where Your Honor permitted then Magistrate Judge Carter to consider a plaintiff's submissions, including affidavits, in determining "whether relief is warranted and, if so, what type of relief is appropriate."  2009 WL 3756630, at * 5 (E.D.N.Y. Nov. 6, 2009).  Although I recognize that Your Honor's decision in *Huff* occurred in a different procedural context, *id.* at * 1, a similar process should be followed here.  *See also RLI Ins. Co. v. May Const. Co., Inc.*, No. 09 Civ. 7415 (PKC), 2011 WL 1197937, at * 4 (S.D.N.Y. Mar. 22, 2011) (court considered plaintiff's submissions, including affidavits and complaint, in deciding liability on motion for default judgment).  Were the Court to deny S&S's motion, it would likely do so without prejudice to S&S's filing and service of an amended complaint containing sufficient facts to support it's breach of contract claims.  That amended complaint would have to be served on Wuhan pursuant to the Hague Convention, and given Wuhan's record of failing to formally appear, the Court would likely be faced with another motion for default judgment in a few months.  Such a course would be a waste of scarce judicial resources.

[11] The default motion and supporting papers are not judicial documents, and therefore need not have been served pursuant to the Hague Convention.  *S.E.C. v. Credit Bankcorp., Ltd.*, No. 99 Civ. 11395 (RWS), 2011 WL 666158, at * 4 (S.D.N.Y. Feb. 14, 2011) (citing *Volkswagenwerk Akiengesellschaft v. Schlunk*, 486 U.S. 694, 700, 108 S.Ct. 2104, 100 L.Ed.2d 722 (1988) (finding that the history of the Hague Convention "supports our view that Article I [of the Convention] refers to service of process in the technical sense"); 1 B. Ristau, International Judicial Assistance (Civil and Commercial) § 4–2 (2000 revision) (recognizing that the Hague Service Convention applies only where there is a need to make "formal delivery" of a judicial document "to charge [the recipient] with notice of the institution of a legal proceeding").

actively promote [Wuhan's] products in the American market through advertisement, trade shows, etc." (Emphasis added). S&S contends that by selling it a non-functioning boring mill, Wuhan failed "to provide machinery with such specifications, prices, and/or deliveries as are required by ¶3 of the Agreement." (Compl. ¶ 8.) The problem is, however, that paragraph 3 does not require Wuhan to do anything, let alone "provide machinery" of any specific quality or type. Regardless of S&S's subjective interpretation, the entire paragraph speaks unambiguously to *S&S's* obligations, not Wuhan's. *See St. John's Univ. v. Bolton*, 757 F. Supp. 2d 144, 158 (E.D.N.Y. 2010) (unambiguous contracts to be interpreted according to their plain meaning). No other provision of the Agreement speaks to Wuhan's obligation to provide any specific quality or type of machinery, and therefore I can glean no general intent of the parties to impose upon Wuhan any obligations with respect to paragarph 3. Wuhan, therefore, cannot have breached paragraph 3 of the Agreement.

On the other hand, paragraphs 4 and 5 both speak to Wuhan's obligations to provide S&S with, among other things, "necessary technical and sales materials" and "dispatch appropriate technical personnel to assist [S&S] in product service and maintenance," respectively. These provisions Wuhan clearly breached. (Compl. ¶¶ 8-10; Srybnik Aff. ¶¶ 45-46.) Accordingly, default judgment should enter only for Wuhan's breaches of paragraphs 4 and 5 of the Agency Agreement.

D.    Damages

A defendant's default does not constitute an admission of allegations pertaining to damages. *Lyons P'ship, L.P. v. D & L Amusement & Entm't, Inc.*, 702 F. Supp. 2d 104, 111 (E.D.N.Y. 2010) ("A defendant's default is an admission of all well-pleaded factual allegations in

the complaint except those relating to damages."); *see also Greyhound*, 973 F.2d at 158.  The

court must ensure that there is a factual basis for the damages sought, and may do so either by

conducting a hearing or relying on affidavits and other documentary evidence.  *See* Fed. R. Civ.

P. 55(b); *Transatl. Marine Claims Agency, Inc. v. Ace Shipping Corp.*, 109 F.3d 105, 111 (2d

Cir. 1997) (inquest by affidavit suffices in providing basis for award of damages in default)

(citing *Tamarin v. Adams Caterers, Inc.*, 13 F.3d 51, 54 (2d Cir. 1993)).

A default does, however, constitute an admission of damages.  *Greyhound,* 973 F.2d at

158 (internal citation omitted).  The moving party therefore need prove "only that the

compensation sought relate to the damages that naturally flow from the injuries pleaded." *Id.* at

159.  In so doing, the movant is entitled to " all reasonable inferences from the evidence offered."

*Au Bon Pain Corp. v. Artect, Inc.*, 653 F.2d 61, 65 (2d Cir. 1981) (citing *Trans World Airlines,*

*Inc. v. Hughes*, 308 F. Supp. 679, 683 (S.D.N.Y. 1969)).

Here, S&S seeks a total of $411,791.87 in incidental and consequential damages for the

following:

| | |
|---|---|
| Travel to China to negotiate the Agency Agreement | $20,337.34 |
| Down payment on the boring mill | $39,600[12] |
| Shipping of the boring mill to the United States | $12,552.78 |
| Costs incurred in displaying boring mill at IMTS | $39,125.95 |
| Costs incurred in trying to make boring mill operable | $8,575.80 |
| Storage of inoperable boring mill after IMTS | $291,600 |

S&S also seeks pre- and post-judgment interest on these amounts, and lost profits of an

undisclosed amount.  In his Affidavit, Srybnik supports S&S's incidental and consequential

damages claims with business records, invoices, and credit card statements.  (Syrbnik Aff. ¶¶ 8,

---

[12] In his affidavit, Mr. Srybnik states that S&S paid Wuhan $39,600 as a down payment
(¶ 22), but calculates S&S's loss based on a down payment of $36,900 (¶ 57).  S&S financial
records confirm that it paid $39,600 as a down payment for the machine.  (Srybnik Aff., Exh. E.)

22, 29-44, 47, 50 and attached exhibits.)  The only question is whether S&S is legally entitled to recover each item of damages sought.

In breach of contract actions under New York law, "the nonbreaching party may recover general damages which are the natural and probable consequence of the breach." *Kenford Co. v. County of Erie*, 73 N.Y.2d 312, 319 (1989).  Special, or consequential damages, which "do not so directly flow from the breach," are also recoverable in limited circumstances.  *American List Corp. v. U.S. News & World Report*, 75 N.Y.2d 38, 43 (1989).  The New York Court of Appeals noted in *Kenford* that

> [i]n order to impose on the defaulting party a further liability than for damages [which] naturally and directly [flow from the breach], *i.e.*, in the ordinary course of things, arising from a breach of contract, such unusual or extraordinary damages must have been brought within the contemplation of the parties as the probable result of a breach at the time of or prior to contracting.

73 N.Y.2d at 319 (internal quotation and citations omitted). [13]

To determine whether consequential damages were reasonably contemplated by the parties, courts must look to "the nature, purpose and particular circumstances of the contract known by the parties . . . as well as 'what liability the defendant fairly may be supposed to have

---

[13]  The vast majority of the cases upon which S&S relies in seeking each item of damages involve recovery under Article 2 of the New York Uniform Commercial Code.  *E.g.*, *Exp. Dev. Can v. Elec. Apparatus & Power, L.L.C.*, No. 03 CV 2063 (HBP), 2008 WL 4900557 (S.D.N.Y. Nov. 14, 2008); *Computer Strategies, Inc. v. Commodore Business Machines, Inc.*, 105 A.D.2d 167 (2nd Dep't 1984); *Travelers Indem. Co. v. Maho Machine Tool Corp.*, 952 F.2d. 26 (2d Cir. 1991); *Billion Tower Int'l, LLC v. MDCT Corp.*, No. 08 Civ. 4185 (LAK)(JLC), 2010 WL 5536513 (S.D.N.Y. Dec. 10, 2010).  Article 2 of the N.Y. U.C.C., however, does not apply here as the Agency Agreement is not a contract for the sale of goods.  *See* N.Y. U.C.C. § 2-102.  While paragraphs 6 and 7 contemplate S&S's purchases of vertical boring mills, paragraph 8 provides for payment terms going forward, and paragraph 9 provides that Wuhan will supply S&S with "machines" in the future, the Agency Agreement does not contain any other indicia of a true contract for the sale of goods – price, quantity, description of specific goods purchased, etc.  Therefore, the cases upon which S&S rely are inapposite.

17

assumed consciously, or to have warranted the plaintiff reasonably to suppose that it assumed, when the contract was made.'" *Id.* (quoting *Globe Ref. Co. v Landa Cotton Oil Co.*, 190 US 540, 544 [Holmes, J.]).  Of course, proof of consequential damages cannot be speculative or conjectural.  "The rule that damages must be within the contemplation of the parties is a rule of foreseeability.  The party breaching the contract is liable for those risks foreseen or which should have been foreseen at the time the contract was made. The breaching party need not have foreseen the breach itself, however, or the particular way the loss came about. It is only necessary that loss from a breach is foreseeable and probable." *Ashland Mgmt. Inc. v. Janien*, 82 N.Y.2d 395, 403 (1993) (citing Restatement [Second] of Contracts § 351, 352; 3 Farnsworth, Contracts § 12.14 [2d ed 1990]).

Contract Negotiation Expenses

S&S is not entitled to recover its travel expenses to and from China to negotiate the Agency Agreement.  S&S has referenced no provision in the Agency Agreement itself or case law to support the notion that it should be awarded damages for expenses incurred prior to the execution of a contract that is eventually breached.  Such amounts are not "general damages which are the natural and probable consequence of the breach." *Kenford,* 73 N.Y.2d at 319.  They also do not appear to have been contemplated by the parties as there is not even a vague reference to them in the Agency Agreement itself.  The cases that S&S does cite in support of these damages all involve recovery of expenses incurred after in remedying a contractual breach, not expenses incurred in negotiating the contract itself.  *E.g., Afolabi v. Jones*, No. 06 CV 2756 (RJD)(MDG), 2008 WL 4890166, at *1, 4 (E.D.N.Y. Nov. 12, 2008).  Those cases are therefore inapposite.

Costs Related to the Purchase of the Boring Mill,
the IMTS, Attempted Repair, and Storage

S&S is entitled to recover the costs it incurred in purchasing the boring mill, having it

shipped from China to the United States, having it transported to and from Chicago for showing

at the IMTS,[14] hiring another company to attempt to fix the inoperable mill, and then storing the

inoperable mill in Brooklyn these many years. All of these costs and expenses were incurred as a

result of entering into the Agency Agreement, and were reasonably foreseeable by the parties.

S&S sought out Wuhan and forfeited its business with other international manufacturers

in order to become Wuhan's sole and exclusive distributor in North and South America. Wuhan

was aware that S&S is a reseller. In fact, that was the entire purpose of the Agency Agreement –

for S&S to resell Wuhan's machinery in North and South America. Wuhan knew S&S

purchased this specific vertical boring mill for the purpose of taking it to the IMTS in Chicago

and later reselling it. It was reasonably foreseeable that as a reseller, S&S would not be able to

resell the boring mill if it was inoperable. Wuhan did not offer to cure the breach by arranging

for the machine to be delivered back to China and sending S&S a new machine, nor did Wuhan

give S&S any instructions on how to make the machine operable for resale. Thus, it was entirely

foreseeable that S&S would have to hire another company to attempt to fix the inoperable mill,

and failing that would incur costs for storing the inoperable machine.[15]

---

[14] S&S seeks only half of the $86,251.89 it incurred in attending the IMTS, minus $4,000 S&S was required to pay pursuant to the Agency Agreement for the two Wuhan employees to attend the IMTS. S&S recognizes that even absent the Agency Agreement, it would have attended the IMTS and incurred substantial costs.

[15] Although at first glance it may seem at odds with the arbitration provision in the Purchase Contract to permit S&S to recover the $39,600 down payment for the boring mill in this action, I do not think it is. As discussed above, the CIETAC arbitral panel left open S&S's

Accordingly, I respectfully recommend that Wuhan be held liable for $391,454.53 in damages related in purchasing the boring mill, having it shipped from China to the United States, having it transported to and from Chicago for showing at the IMTS, hiring another company to attempt to fix the inoperable mill and then storing the inoperable mill in Brooklyn these many years.

<u>Lost Profits</u>

S&S is not entitled to lost profits on future sales of Wuhan products. (Pl. Mem. at 19-21; Srybnik Aff. ¶58.) To support this claim, S&S submitted a list of 180 foreign-made boring drills it sold from 1973 to 1990. (Srybnik Aff. Exh. Q.)[16] Deeming this evidence to be too temporally attenuated and lacking sufficient detail from which to base an award of lost profits,[17] I ordered S&S to submit information about lost profits related to sales of comparable machines from 1994 to 1999, the five-year period immediately preceding execution of the Agency Agreement. (*See* Docket Entry dated 11/14/11); *see also Ashland Mgmt. Inc.*, 82 N.Y.2d 395 at 403 ("A party may not recover damages for lost profits unless they were within the contemplation of the parties at the time the contract was entered into and are capable of measurement with reasonable certainty."); *ATC Healthcare Services, Inc. v. Personnel Solutions, Inc.*, NO. 01-CV-762 (CBA),

---

ability to require Wuhan to compensate it for the quality "of the goods in the form of counterclaim or lodging arbitration, or remedy in other ways. . . ." (Arbitral Award at 29.) This is just such a way.

[16] S&S claimed it had records in its possession from which "a calculation of S&S Machinery's profits on all such sales" could be made. (Srybnik Aff. ¶59.)

[17] It is impossible to determine S&S's lost profits with reasonable certainty because there is no information in the list as to the price at which these boring drills were sold, or the actual profits derived from the sales.

2006 WL 3758618, at*11 (E.D.N.Y. Dec 19, 2006) (stating that a claimant cannot recover lost profits that are "merely speculative, possible, or imaginary") (internal citation and quotation omitted). S&S declined to submit such evidence, arguing that it did not want to "incur the additional expenses of compiling and submitting this information" in light of "the vagaries involved in attempting to enforce a judgment in China." (Docket No. 39.) S&S should therefore be deemed to have abandoned its request for lost profit damages.

Pre-Judgment Interest

S&S, is entitled to pre-judgment interest because it has prevailed on a breach of contract claim. *See United States Naval Inst. v. Charter Commns., Inc.*, 936 F.2d 692,698 (2d Cir. 1991) (citing C.P.L.R. §§5001 and 5002) (upholding the district court's award of pre-judgment interest based on its finding that plaintiff could recover damages for breach of contract); *Carco Group, Inc. v. Maconachy*, 05-cv-6038 (ARL), 2011 WL 2971587, at * 14 (E.D.N.Y. July 19, 2011). "In a diversity case, state law governs the award of prejudgment interest." *Schipani v. McLeod*, 541 F.3d 158, 164 (2d Cir. 2008) (citing *Baker v. Dorfman*, 239 F.3d 415, 425 (2d Cir. 2000)). In New York, the statutory pre-judgment interest rate on a breach of contract claim is nine percent per year. *See* N.Y. C.P.L.R. §5004. Pre-judgment interest is computed from the "earliest ascertainable date" and "upon each time from the date it was incurred or upon all of the damages from a single reasonable intermediate date." *See* N.Y. C.P.L.R. §5001 (b).

S&S began incurring costs associated with Wuhan's breach in 2000, when it paid for the inoperable vertical boring drill. However, since S&S incurred damages at various times, S&S has suggested that the Court calculate pre-judgment interest as of December 31, 2000. I agree that this is a reasonable intermediate date for the purposes of pre-judgment interest. Pre-

judgment interest should be awarded to S&S based on the following calculation: ($391,454.53 x

.09)/365 = $96.52 per diem from December 31, 2000 through the date of entry of final judgment.

Post-Judgment Interest

Pursuant to 28 U.S.C. § 1961, S&S is entitled to post-judgment interest at the statutory

rate from the date of entry of final judgment.


**CONCLUSION**

For the reasons explained above, I respectfully recommend that S&S be awarded

$391,454.53 in damages, plus pre-judgment interest at a rate of $96.52 per diem from December

31, 2000 through the date of entry of final judgment, as well as post-judgment interest to be

calculated by the Clerk of the Court.

Any objections to the recommendations made in this Report must be filed with the Clerk

of the Court and the Honorable Nicholas G. Garaufis within fourteen days of receipt hereof.

Failure to file timely objections may waive the right to appeal the District Court's Order.  *See* 28

U.S.C. § 636(b)(1); FED. R. CIV. P. 6(a), 6(e), 72; *Small v. Sec'y of Health & Human Servs.*, 892

F.2d 15, 16 (2d Cir. 1989).

**Dated: January 13, 2012**
      **Brooklyn, New York**

*Ramon E. Reyes, Jr.*
**Ramon E. Reyes, Jr.**
**United States Magistrate Judge**